UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

PERCY A. BRYANT, JR.,                          CIVIL ACTION NO.

          **Plaintiff,**

VERSUS
                                                JUDGE BARBIER
BP EXPLORATION & PRODUCTION,                    MAG. JUDGE CURRAULT
INC., BP AMERICA PRODUCTION
COMPANY, AND EPIQ CLASS ACTION
& CLAIMS SOLUTIONS, INC.,
          **Defendants.**

Related to:    **12-968 BELO**
               **in MDL No. 2179**

## BELO COMPLAINT

**COMES NOW**, Plaintiff, PERCY A. BRYANT, JR. ("Plaintiff"), by and through

the undersigned counsel, and hereby brings this cause of action against BP Exploration &

Production, Inc. ("BP Exploration"), BP America Production Company ("BP America"), and

Epiq Class Action & Claims Solutions, Inc. ("EPIQ") and hereby states as follows:

### INTRODUCTION

1.      This is an action arising out of injuries suffered by PERCY A. BRYANT, JR. as a result of

exposure to oil, other hydrocarbons, dispersants, pollutants, and other toxic substances due to the

BP Deepwater Horizon Oil Spill, which occurred on or around April 20, 2010 ("DWH Oil Spill").

### INTRODUCTION OF PARTIES

#### *Plaintiff*

2.      Plaintiff is a Natural Person of the age of majority, who currently resides in resides in

Stockton, Alabama, and as such, is a citizen and resident of Baldwin County, Alabama.

3.      Plaintiff worked as a Shoreline Clean-up Worker, equipment operator, and supervisor for the DWH Oil Spill from approximately May 2010 through April 2012 and as such, is a Class Member as defined by the Medical Benefits Class Action Settlement Agreement ("MSA").[1]

*Defendants*

4.      Pursuant to the terms of the MSA, Defendants herein are BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY (collectively "BP Defendants"), and EPIQ CLASS ACTION & CLAIMS SOLUTIONS, INC. (EPIQ). The BP Defendants are both Delaware corporations with their principal places of business in Houston, Texas. EPIQ is incorporated in Rhode Island with its principal place of business in Beaverton, Oregon.

5.      BP Exploration was a leaseholder and performed oil exploration, drilling, and production related operations, including at the Mississippi Canyon Block 252 in the Gulf of Mexico ("Macondo Well" or "Well") where the DWH Oil Spill originated.

6.      The United States Coast Guard designated BP Exploration as a "Responsible Party" of the DWH Oil Spill.[2]

7.      At all times relevant to this action, BP Exploration purposely availed itself of this Court's personal jurisdiction by performing various acts related to the DWH Oil Spill including:

        i.      Managing Clean-Up and/or Response Activities in and/or around the waters, shores, coastlines, and air of Alabama, Louisiana, Mississippi, Florida, and Texas (collectively "Gulf States");

---

[1] Deepwater Horizon *Medical Benefits Class Action Settlement Agreement, as Amended on May 1, 2012*, MDL 2179, Rec. Doc. 6427-1 (May 3, 2012), § I.A; § II.EEE.
[2] *See* Case No.: 2:10-md-02179-CJB-SS, Rec. Doc. 1805-1.

    ii.    Pumping crude oil during the DWH Oil Spill that polluted the coasts of the Gulf States and surrounding environments;

    iii.    Directing Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

    iv.    Participating with Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

    v.    Engaging in commerce by purchasing, distributing, and supplying goods and services in the Gulf States, including petroleum products, dispersants, and other supplies and services for various Clean-Up Response Activities; and

    vi.    Maintaining a presence in the Gulf States by doing business in the Gulf States.

8.    BP America contracted with Transocean Holdings for the drilling of the Macondo Well.

9.    The United States Coast Guard designated BP America as a "Responsible Party" of the DWH Oil Spill.[3]

10.    At all times relevant to this action, BP America purposely availed itself of this Court's personal jurisdiction by performing various acts related to the DWH Oil Spill, including:

    i.    Managing Clean-Up and/or Response Activities in and/or around the waters, shores, coastlines, and air of the Gulf States;

    ii.    Pumping crude oil during the DWH Oil Spill, which polluted the coasts of the Gulf States and surrounding environments;

    iii.    Directing Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

---

[3] *Id.*

     iv.     Participating with Unified Command, which contracted with various Clean-Up Response Companies throughout the Gulf States;

     v.     Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf Residents, which included petroleum products, dispersants, and other supplies and services for various Response Activities; and

     vi.     Maintaining a presence in the Gulf States by doing business in the Gulf States.

11.     Pursuant to the MSA, the Court designated Garretson Resolution Group ("GRG"), now known as EPIQ Class Action & Claims Solutions, Inc. ("EPIQ"), as the Claims Administrator.

12.     The Claims Administrator was a role created for a neutral third party to perform ministerial functions. The Claims Administrator was not granted judicial powers and/or decision-making authority.

13.     The Claims Administrator is supposed to perform their ministerial function and process a Notice of Intent to Sue when it is timely submitted by deeming it "valid' or "invalid" and then submitting the claims deemed valid to BP to determine whether they wish to mediate said claim and/or issue an Election not to Mediate.[4]

---

[4] It must be noted that the condition precedent contained in the MSA (see page 64) which requires the plaintiff to submit a Notice of Intent to Sue accompanied by the diagnosing record and/or a Physician's Certification form and then delay the plaintiff's claim until BP issues an "election NOT to mediate" has become unduly burdensome and an unconstitutional barrier that impacts an individual's access to Court. This is because, as of today, the plaintiffs, collectively, have incurred cost and delay due to this condition precedent but have received no corresponding benefit. Arguably, this program was designed to benefit plaintiff by allowing BP to mediate, pre-suit, and possibly resolve, cases which have merit. However, as of today, BP has not mediated or resolved any of the claims submitted via this pre-suit administrative process. Therefore, this expected benefit from the pre-suit, condition precedent never materialized and, thus, is solely a burden to the plaintiff.

## JURISDICTION AND VENUE

14.     This is a Back-End Litigation Option ("BELO") lawsuit for Later Manifested Physical Conditions ("LMPC") filed pursuant to the terms and requirements of the MSA.[5]

15.     This Court has jurisdiction over this matter pursuant to 28, U.S.C. § 1332, because all parties are diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

16.     Additionally, this Court has Jurisdiction based on Federal Question jurisdiction under 28 U.S.C. § 1331, in that Article III, Section 2 of the United States Constitution empowers the federal judiciary to hear "all cases of admiralty and maritime jurisdiction."

17.     Alternatively, this Court has subject matter jurisdiction pursuant to 43 U.S.C. § 1349(b)(1), which provides that "[t]he district courts of the United States shall have jurisdiction of cases and controversies arising out of . . . (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals . . . ."[6]

18.     Furthermore, in the event this Court lacks jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) and/or 43 U.S.C. § 1349(b)(1), this Court also has jurisdiction pursuant to 28 U.S.C. § 1333 and the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to "[c]ases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."[7]

---

[5] MSA § VIII.G.
[6] *See* 43 U.S.C. § 1349(b)(1).
[7] See 46 U.S.C. § 30101(a).

19.    The Eastern District of Louisiana has and retains jurisdiction pursuant to the MSA and approval order thereon. "[T]he [c]ourt retains continuing and exclusive jurisdiction over the Parties, the Medical Benefits Settlement Class Members and this Medical Benefits Class Action Settlement Agreement, to interpret, implement, administer and enforce the Medical Benefits Class Action Settlement Agreement in accordance with its terms."[8]

20.    The MSA in MDL 2179 requires all such BELO actions to be initially filed in this Court. The MSA, however, also provides that a BELO action may be later transferred to another district court consistent with the Federal Rules.[9]

21.    The Southern District of Alabama is the most appropriate venue. Plaintiff worked during his clean-up operations for the DWH Oil Spill in the state of Alabama. While working as a Shoreline Clean-Up Worker, Plaintiff was exposed to oil, hydrocarbons, and other toxic substances released from the MC252 Well and/or the Deepwater Horizon and its appurtenances, and/or dispersants and/or decontaminants used in connection with his Response Activities.[10] Moreover, Plaintiff's current place of residence is in Stockton, Alabama. Lastly, m a n y  of  Plaintiff's witnesses and other relevant sources of proof, such as Plaintiff's treating doctors, are also located in Alabama. Considering the relative ease of access to sources of proof, the ability to  secure attendance of witnesses, and the ability to minimize costs of witnesses, the appropriate  venue for this cause of action is the Southern District of Alabama.

22.    Plaintiff has attempted to properly and timely comply with all conditions precedent for a class member who is filing a claim for an LMPC, including, but not limited to, submitting a timely Notice of Intent to Sue (hereinafter, "NOIS") dated July 5, 2024.  In response to this submission,

---

[8] MDL Rec. Doc. No. 8218 (approval order), MDL Rec. Doc. No. 6427-1 (MSA § XXVII); *see also*, MDL Rec. Doc. No. 14099 (BELO CMO).
[9] MSA, § VIII.G(1)(c).
[10] MSA, § VIII.G(3)(b)(iii).

EPIQ never processed the NOIS, never advised Plaintiff whether this submission was "valid" or "defective," and never sent the NOIS to BP so that BP could take action by mediating the case pre-suit and/or refuse to mediate the case pre-suit so that an "Election not to Mediate" could be issued. As a result, as a matter of fact and law, it was impossible for the Plaintiff in this matter to satisfy the condition precedent contained in the MSA to obtain a timely and proper Election not to Mediate prior to filing suit. The failure to satisfy this condition precedent was at no fault of Mr. Bryant and solely due to EPIQ's refusal to act pursuant to their ministerial duties as the Claims Administrator.

## GENERAL FACTS

**I.    Response Activities Exposed Plaintiff to Numerous Toxic Chemicals.**

23.    Plaintiff references, incorporates, and adopts all findings of fact detailed in *Findings of Fact and Conclusions of Law* ("Phase One Findings"), MDL No. 2179, Rec. Doc. 13355, 21 F.Supp.3d 657 (E.D. La. 2014).

24.    The DWH Oil Spill occurred with the blowout of the Macondo Well which was drilled by the Deepwater Horizon Rig (DHR) on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

25.    On April 20, 2010, workers on the Deepwater Horizon Oil Rig lost control of the Macondo Well just after the final cementing work was completed. During the cementing work, an explosion occurred on the Deepwater Horizon, and it caught fire.

26.    The explosion and fire itself caused the deaths of eleven (11) people and at least seventeen (17) others were injured from the immediate April 20, 2010 incident alone.

27.    The explosions and/or fire should have triggered the automatic function on the vessel's Blowout Preventer ("BOP"). However, the function failed, or the BOP failed to shut in the Well.

28.    The Deepwater Horizon was connected to the wellhead at the seafloor by an approximately 5,000-foot pipe called a "riser" and, as the vessel sank, it pulled the riser down with it – bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape underwater, extended approximately 1,500 feet above the seabed, and then buckled back down. Oil flowed out from the open end of the riser, and through two (2) breaks along its length.

29.    On or about April 22, 2010, the vessel sank to the ocean floor after burning for approximately two (2) days.

30.    Millions of gallons of oil discharged into the Gulf of Mexico over the next 87 days.

31.    Finally, after multiple unsuccessful attempts, the well was capped and oil discharge was halted on July 15, 2010, and by mid-September, it was permanently sealed with cement.

32.    Crude oil and other hydrocarbons were released following the explosion.

33.    While crude oil was believed to be discharged before the Deepwater Horizon platform sank on or about April 22, 2010, the rate of discharge is believed to have increased once the Deepwater Horizon sank to the ocean floor.

34.    After the explosion and sinking of the *Deepwater Horizon*, BP Defendants attempted to downplay and/or conceal the severity of the DWH Oil Spill. Its initial leak-estimate of 1,000 barrels of oil per day was found by government investigators to be a fraction of its measured leakage, 50,000 barrels per day. Moreover, BP Defendants did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the DWH Oil Spill.

35.    On or about June 20, 2010, then-Congressman Edward Markey of Massachusetts released an internal BP document showing that the company's own analysis had revealed the actual rate of oil leakage to be 4,200,000 gallons per day and that the total oil leakage could reach 100,000 barrels per day.

36.    This crude oil contained benzene, other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes, and heavy metals such as aluminum, cadmium, nickel, lead, and zinc.

37.    According to the Agency for Toxic Substances and Disease Registry, which is part of the United States Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, and lethal central nervous system depression.

38.    A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long term, low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping, memory loss, and cancer.

39.    Crude oil contains chemicals such as benzene, PAHs, and many other chemicals that are toxic, which naturally move from the oil into the air. Once airborne, these chemicals and/or gasses, with pungent petroleum-like odors, can blow over the ocean for miles, reaching communities far from the location of the DWH Oil Spill.

40.    The flow of oil continued unabated and the oil made landfall on or about April 30, 2010.

41.    The DWH Oil Spill created an oil slick with a range of thousands of miles, with thick voluminous plumes of oil in the deep waters within the Gulf of Mexico. The Oil Spill caused these slicks and plumes to form.

42.    The oil infiltrated, and continues to infiltrate, the delicate wetlands and intertidal zones that protect the coasts of Louisiana, Mississippi, Alabama, Texas, and Florida.

43.    The leaked crude oil contains many highly toxic and hazardous chemicals that can damage nearly every system in the human body. An estimated 200-million gallons of crude oil infiltrated sensitive coastland and intertidal ecosystems.

44.    Subsequently, Response Activities were performed by Clean-Up Workers under the direction of Unified Command.

45.    BP Defendants began implementing a Disaster Response Plan to prevent oil from escaping the blown-out Well, manually contain the oil, and disperse oil in the water using chemical dispersants.

46.    As part of its response to the *Deepwater Horizon Incident*, BP Defendants directed the use of vessels to, *inter alia*, recover oil coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct in-*situ* burning of oil that reached the surface of the water. BP Defendants also employed vessels to tow and deploy booms—floating barriers intended to contain, deflect, or hold back oil floating on the water's surface.

47.    As part of this effort, both onshore and off-shore Clean-Up Workers, as well as residents, came into contact with crude oil, dispersants, and oil/chemical mixtures as they worked and slept.

48.    Additionally, as part of the Response Activities, BP Defendants purchased highly noxious chemical dispersants from NALCO and/or its subsidiaries, including COREXIT EC9500 and COREXIT EC9527A. These dispersants were applied over large areas using various methods, including but not limited to, spraying from airplanes, spraying from vessels, and subsea injection.

49.    COREXIT contains hazardous substances and is harmful to human health. The substances in COREXIT are known to cause numerous health conditions, including, but not limited to acute

and chronic physical and neurological conditions and diseases; respiratory and pulmonary conditions; cardiological conditions; adverse central nervous system effects; ocular conditions; dermal conditions; gastrointestinal conditions; liver and kidney effects; damage to developing fetuses; and various forms of cancers and metastatic diseases.

50.    Epidemiologic literature generally supports the premise that breathing even a small amount of aerosolized vapor from the crude oil/Corexit mixture will produce cellular and anatomical harm to the human respiratory system in the form of both immediate discomfort and irritation, and epithelial cell damage which may produce long-term respiratory issues, such as asthma.[11]

51.    Consequently, on or about May 20, 2010, the U.S. Environmental Protection Agency ("EPA") directed Defendants to identify a chemical dispersant less toxic than COREXIT within 24 hours and begin using it within 72 hours.

52.    On May 20, 2010, Defendants objected to this order and notified the EPA that it would continue using COREXIT.[12]

53.    BP Defendants' use of Corexit skyrocketed in May of 2010. On May 22, 2010, BP Defendants used 45,000 gallons of Corexit. On May 23, 2010, BP Defendants used 70,000 gallons of Corexit.

54.    On May 26, 2010, the EPA directed BP Defendants to reduce overall use of Corexit by 75%. This EPA directive also required BP Defendants to eliminate use of chemical dispersants on the surface, except in rare cases where an exemption is sought in writing from and approved by the United States Coast Guard Federal On-Scene Coordinator in charge of the Response Efforts.

---

[11] *Heme Oxygenase-1 Protects Corexit 9500A-Induced Respiratory Epithelial Injury across Species*, Veena B. Antony, et al., published April 2, 2015.
[12] Defendants' use of COREXIT skyrocketed (BP used 45,000 gallons on May 22, 2010, and 70,000 gallons on May 23, 2010). Defendants only stopped using COREXIT EC9527A on or about May 23, 2010, when supplies ran out and thereafter relied on COREXIT EC9500.

55.    After the May 26, 2010 EPA directive, BP Defendants sought more than forty (40) exemption requests to use chemical dispersants on the surface and subsea in the Gulf of Mexico.

56.    According to the Aerial Dispersant Operations – Houma Status Report, by July 19, 2010, Defendants had ordered the application of nearly one million[13] gallons of dispersants covering approximately 291 square miles of the Gulf.

57.    In response to criticism regarding Defendants' use of COREXIT in the Gulf, BP's Group Chief Executive at the time and former CEO, Bob Dudley, defended the use of COREXIT, stating that "the toxicity of COREXIT is about the same as dish soap, which is effectively what it is and how it works."[14] He further misrepresented the danger by stating that the Gulf of Mexico is "an ecosystem that's used to oil. So, oil on the water is not something new."

58.    On the contrary, the two types of Corexit used in the cleanup (Corexit EC9500 and EC9527A) contain arsenic, cadmium, chromium, copper, lead, mercury, nickel, and zinc.

59.    Corexit EC9527A also contains 2-butoxyethanol ("EGBE"). Repeated or excessive exposure to EGBE can cause injury to red blood cells, the kidneys, and the liver. EGBE can be carcinogenic to humans. It is an eye, nose, and throat irritant that causes nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness.

60.    The Material Safety Data Sheets ("MSDS") for both Corexit EC9500 and Corexit EC9527A indicate that the dispersants contain hazardous substances harmful to human health, for which dermal exposure, inhalation, and ingestion should be avoided. The MSDS for Corexit

---

[13] The exact amount of 972,880 gallons. *See* Houma ICP Aerial Dispersant Group. After Action Report Deepwater Horizon MC252 Aerial Dispersant Response. (December 31, 2010).
[14] K. Savage, *BP Head Bob Dudley Defends Dispersant Use, as Gulf Coast Communities Speak Out at Shareholder Meeting* (Apr. 17, 2013), available at http://bridgethegulfproject.org/blog/2013/bp-head-bob-dudley-defends-dispersant-use-gulf-coast-communities-speak-out-shareholder.

EC9527A further states that it is an eye and skin irritant and may irritate the respiratory tract if inhaled; and, if ingested, Corexit EC9527A may cause liver and kidney effects and/or damage or irritate the gastrointestinal tract.

61.    Clean-Up Workers were often directly exposed to COREXIT as aerial spray planes both recklessly and intentionally sprayed chemical dispersants on the water despite the presence of Vessels of Opportunity ("VOO"") and other boats in the vicinity whose crews were performing offshore clean-up work, thereby misting or spraying Clean-Up Worker boat crews with these toxic dispersants. Further, near-shore and beach Clean-Up workers were sprayed with COREXIT as the winds from the south would often blow it off the Gulf and onto the beaches.

62.    The dispersant-treated and raw crude oil carried significant public health risks because it contained highly toxic chemicals, which can damage various systems in the human body.

63.    The crude oil/Corexit mixture eventually arrived on the shores of the Gulf Coast where clean-up workers and residents came in direct contact. Inevitably, when Corexit mixes with crude oil, it becomes inseparable from the oil, causing the oil to breakdown into smaller micro particles known as Fine Particulate Matter ($PM_{2.5}$). The near shore "bubble bursting" wave action (sea spray) caused the oil/Corexit mixture to aerosolize the microparticles, creating a toxic mist rapidly shifting between vapor and gaseous phases.[15, 16] These microparticles were inhaled by clean-up workers and coastal residents.

64.    According to the *BP Deepwater Horizon Gulf Study*, funded by the BP Defendants themselves, upstream petrochemical workers have reported experiencing leukemia, multiple

---

[15] *Impact of Dispersant on Crude Oil Content of Airborne Fine Particulate Matter Emitted from Seawater After an Oil Spill*, Nima Afshar-Mohajer, et al., published May 19, 2020.
[16] *Effect of Oil Properties on the Generation of Nano-Aerosols During Bubble Bursting Through Crude Oil-Dispersant Slicks*, Diego F. Muriel, et al., published November 5, 2021.

myeloma, melanoma, and esophageal adenocarcinoma; additionally, the study showed that the toxic effects on the human body are 52-times more toxic when Corexit and crude oil are combined.

65.    In the aftermath of the DWH Oil Spill, the BP Defendants hired various incentivized consultants and contractors that generated "scientific" findings and testing biased in favor of the BP Defendants. These include BP's environmental,[17] Industrial Hygiene,[18] and litigation support contractors that supervised or assisted in creating the monitoring and sampling data.

66.    BP Defendants' incentivized contractors set detection and reporting limits for chemicals of concern at high levels (i.e. screening levels), and any detection of chemicals that fell below that selected limit were often recorded as a zero value or non-detection. The Industrial Hygiene data collection plans were designed or contemplated, in part, to limit the BP Defendants' liability in future litigation and manufacture scientific doubt about the harmful effects of the DWH Oil Spill.

---

[17] BP hired Exponent during the Spill to collect and oversee the environmental and chemical dispersant data gathering, as well as other services. As stated by Dr. David Michaels—PhD, MPH, epidemiologist and professor at George Washington University— "[—""[g]ive Exponent an A+ for manufactured uncertainty." Michaels, D. (2008). *Doubt is their product: How industry scientists manufacture uncertainty and threaten your health* (p. 138). Oxford University Press. "Having cut their teeth manufacturing uncertainty for Big Tobacco, scientists at . . . Exponent, Inc., and other consulting firms now battle the regulatory agencies on behalf of manufacturers of benzene, beryllium, chromium, MTBH (methyl tertiary-butyl ether), perchlorates, phthalates, and virtually every other toxic chemical in the news today." *Id.* at 46. "They profit by helping corporations minimize public health and environmental protection and fight claims of injury and illness." *Id.*

[18] BP's lead Industrial Hygiene contractor during the Oil Spill—Center for Toxicology and Environmental Health ("CTEH"")—had a "vested interest in finding a clean bill of health to satisfy its corporate employer" according to experts. *See Record of BP's Gulf Worker-testing firm raises conflict-of-interest questions*, N.Y. Times.    Retrieved    July    21,    2022,    from https://archive.nytimes.com/www.nytimes.com/gwire/2010/06/18/18greenwire-recordof-bps-gulf-worker-testing-firm-raises-84788.html. CTEH was later faulted for "improper sample collection procedures, and a 2008 Environmental Protection Agency audit similarly found deficiencies in the company's airmonitoring at the site of a Tennessee coal ash spill." Chase Woodruff, C. N. S. 4. (2020, September 4). *Oil companies rely on controversial firm to rebut Colorado Health Study*. Colorado Newsline. Retrieved July 21, 2022, from    https://coloradonewsline.com/2020/09/04/oil-companies-rely-on-controversial-firm-to-rebut-colorado-health-study/. "This firm also performed toxicity testing on Chinese drywall and found no health risks even though other independent tests had." Button, G. (2016). *In Disaster culture knowledge and uncertainty in the wake of human and environmental catastrophe* (p. 233). Taylor and Francis.

Scientists attempting to work with this data years later to create peer-reviewed and neutral science have described the BP Defendants contractor created testing as "censored" data.[19]

67.     Defendants hired a consultant called the Center for Toxicology and Environmental Health ("CTEH") to perform Industrial Hygiene monitoring during the post-spill response. BP Defendants had knowledge that CTEH was incentivized to under-report the health and safety side of the Deepwater Horizon Oil Spill as CTEH was paid to ensure regulatory compliance for its clients by finding the least protective rules and regulations and relying on those for its monitoring and sampling plans.[20]

68.     At all times relevant to this litigation, BP knew or should have known that: (a) crude oil and dispersants contain chemicals hazardous to human health; (b) Clean-Up Workers like Plaintiff herein were entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; (c)

_____

[19] See Huynh T, Ramachandran G, Banerjee S, Monteiro J, Stenzel M, Sandler DP et al., *Comparison of methods for analyzing left-censored occupational exposure data.* Ann Occup Hyg 2014; 58: 1126–1142 ("Over 150,000 personal exposure measurements for an array of contaminants were collected; however, a substantial number of these measurements was below the limits of detection (LOD) reported by the analytic laboratories, or left-censored (Type I censoring) . . . Despite the large number of measurements, in many cases the number of available measurements for specific exposure groups is small (e.g., <10) and many exposure groups have a high percentage of censored data (50– 100% for many groups). In addition, these measurements are often marked by high variability, probably due to the non-routine nature of some of the activities and changes in these activities over time."). Scientists with the National Institute of Environmental Health and National Institutes of Health noted that approximately 95% of the samples for Total Hydrocarbons and BTEX (benzene, toluene, ethylene, and xylene) were "censored" due to the limits of detection set by contracted laboratories. *See* RK Kwok, LS Engel, AK Miller, et al., *The GuLF STUDY: a Prospective Study of Persons Involved in the Deepwater Horizon Oil Spill Response and Clean-up*, Environ Health Perspect., 125 (2017), pp. 570-78.
[20] Essentially, BP's hiring of CTEH amounted to the "fox guarding the chicken coop" since CTEH was an interested non-party hired by Defendants to find that chemicals of concern in the air were not present at unsafe levels. *See* Schor, E. (2010, June 18). *Record of BP's Gulf Worker-testing firm raises conflict-of-interest questions.* Greenwire. https://archive.nytimes.com/www.nytimes.com/gwire/2010/06/18/18greenwire-record-of-bps-gulf-worker-testing-firm-raises-84788.html. On June 25, 2010, Representatives Capps and Welch issued a letter to BP requesting that BP must "[r]emove CTEH from their role as primary monitor of health issues" and "[e]nlist an independent, well-respected toxicology center to take over this role and ensure valid and reliable public health monitoring" because of CTEH's long history of questionable practices of releasing findings "defending the corporate interests that employ them."

Clean-Up Workers should have been provided adequate personal protective equipment when engaged in Oil Spill clean-up activities; and (d) Clean-Up Workers should have been provided adequate safety training.

69.    BP, aware of the risks that Clean-Up Workers would face, failed to warn Clean-Up Workers of the risks of exposure to the oil and dispersants; failed to provide adequate respirators and protective gear/clothing; failed to provide adequate safety training; and ignored worker safety concerns, even in the face of warnings from the Occupational Safety and Health Administration ("OSHA") and notification by the U.S. Department of Health and Human Services that vessel workers in its VOO program, as well as other offshore and onshore Clean-Up Workers, were complaining of illnesses after being exposed to oil and dispersants.

## II.    BP Found to be Guilty of Manslaughter, Obstruction of Congress, and Liable to Multiple Government Agencies for the Oil Spill in the Immediate Aftermath of the Response Activities.

70.    The Oil Pollution Act of 1990 ("OPA"") imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702. After the Oil Spill, the U.S. Coast Guard designated BP as a "responsible party" under the OPA.

71.    Following an exhaustive investigation into the cause of this enormous disaster, a White House commission faulted BP and its partners for a series of cost-cutting measures that led to insufficient safety systems. In November 2012, BP pled guilty to eleven (11) counts of manslaughter and one (1) felony count of lying to Congress[21], for which the oil giant agreed to pay billions of dollars in criminal fines, penalties, and restitution.

---

[21] ""[T]he felony obstruction of Congress charge reflects the fact that the defendant's criminal conduct extended beyond the events surrounding the blowout itself to the defendant's untruthful post-spill conduct in understanding the scope of the ensuing oil spill to Congress… BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that

72.    On September 4, 2014, the Honorable Carl Barbier, Presiding Judge for the Eastern District

of Louisiana, ruled in the Clean Water Act trial that BP was primarily at fault for the DWH Oil

Spill because of its gross negligence, willful misconduct, and recklessness. (*United States v. BP*

*Expl. & Prod., Inc.*, Findings of Fact and Conclusions of Law, Phase I, No. 10 – 4536 in MDL

2179, Doc. 13381-1, at pp.121–130, 135-136, 152).[22]

73.    BP Defendants already stipulated that Class Members (including Clean-Up Workers) were

"exposed" to oil, and other hydrocarbons, and other substances released from the MC252 WELL

and/or the *Deepwater Horizon* and its appurtenances, and/or Dispersants and/or decontaminants

used in connection with the Response Activities.[23]

74.    BP Defendants are at fault for the DWH Oil Spill and *Deepwater Horizon Incident*.[24] Since

BP Defendants have stipulated to fault and this is equivalent to negligence, BP Defendants are

responsible for any and all damages that were proximately caused as a result of this event,

---

showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD…On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent 'pressure data was obtained from the BOP stack.' At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010" *See* Guilty Plea Agreement at 1, *United States v. BP Expl. & Prod., Inc.*, No. 2:12-CR-00292 (E.D. La, Nov. 15, 2012), ECF No. 2.

[22] *United States v. BP Exploration & Production, Inc*. included the United States' claim for civil penalties against BP Exploration, Inc. and BP American Production Company (defendants herein) and other entities contracted with BP on the Deepwater Horizon under § 311(b) of the CWA, 33 U.S.C. section 1321(b) and OPA.

[23] *See* MSA § VIII.G(3)(b)(iii); § VIII.G(4) ("the BP defendants shall, following the filing of the BACK-END LITIGATION OPTION LAWSUIT, enter into appropriate stipulations to effectuate the provisions of Section VIII.G.").

[24] MSA § VIII.G(3)(b)(ii).

    For purposes of a MEDICAL BENEFITS SETTLEMENT CLASS MEMBER'S BACK-END LITIGATION OPTION LAWSUIT against a BACK-END LITIGATION OPTION DEFENDANT for a LATER-MANIFESTED PHYSICAL CONDITION . . . the following issues, elements, and proofs of a MEDICAL BENEFITS SETTLEMENT CLASS MEMBER'S BACK-END LITIGATION OPTION LAWSUIT against a BACK-END LITIGATION OPTION DEFENDANT for a LATER-MANIFESTED PHYSICAL CONDITION need not be proven and may not be litigated at trial . . . ii) The alleged fault of BP for the DEEPWATER HORIZON INCIDENT.

including, but not limited to any and all damages caused to class members who allege a "Later Manifested Physical Condition."[25]

75.     Plaintiff further incorporates by reference and adopts as if set forth herein the Medical Class Action Complaint previously filed in *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 in the U.S. District Court for the Eastern District of Louisiana, as of April 16, 2012, in Civil Action No. 12-cv-968.[26] Plaintiff also incorporates by reference and adopts as if set forth herein the MSA.

## CAUSES OF ACTION

### Count I: Damages Pursuant to the MSA

76.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 – 75.

77.     During all relevant times, Plaintiff was a Clean-up Worker, performing Response Activities from approximately May 2010 to April 2012 for Plant Performance Services LLC, JW Legacy, Crowder Gulf Disaster, Craft Solutions Inc., and Danos & Curole Staffing in and around Stafford, Texas; Theodore, Alabama; Mobile, Alabama; Denham Springs, Louisiana; Gray, Louisiana; and Gulf Shores, Alabama. Plaintiff worked approximately seven (7) days per week, for approximately twelve (12) hours per day, on a typical workday. During Plaintiff's completion of Response

---

[25] Section VIII of the MSA titled Back -End Litigation Option For Later Manifested Physical Conditions is a misnomer. This title is a reference to a previous draft of the MSA which made reference to the date of manifestation as the important factor when differentiating Specific Physical Conditions and Later "Manifested" Conditions. However, subsequent drafts changed this language from date of ***manifestation*** to date of ***diagnosis***. The revised language required the Notice of Intent to Sue and materials therewith must be submitted to the Claims Administrator within 4 years of either the **first diagnosis** of that Later Manifested Physical Condition or the Effective Date, whichever is later. Eventually, the final draft of the MSA contained this language of date of diagnosis. However, the title to the section was never changed to comport with the final language of the MSA.  Therefore, this section should be titled, "Later Diagnosed Physical Conditions." *See* MSA § VIII.
[26] Medical Class Action Complaint, No. 12-cv-968, Rec. Doc 1.

Activities, Plaintiff was provided with personal protective equipment (PPE) including sunglasses, gloves, and boots that were shared between shifts. His clothes were regularly covered in oil by the end of the day. Plaintiff had a variety of different duties during the relevant time period, including, performing Response Activities, such as spotting and retrieving tar balls for disposal, transporting clean-up workers between different sites, removing and decontaminating booms, decontaminating tyvek suits, operating equipment, driving tractors, transporting port-a-potties on the beach for clean-up workers to use, disposing of soiled material collected at the shoreline, and supervising beach clean-up workers. Therefore, during the relevant times, Plaintiff contends that he was subjected to continuous exposure to BP's toxic substances through his DWH Oil Spill clean-up and response work activities.

78.    The MSA stipulates to the fact that this Plaintiff, a Class Member, was exposed to oil, other hydrocarbons, and other substances released from the MC252 Well and/or the Deepwater Horizon and its appurtenances and/or Dispersants and/or decontaminants used in connection with Response Activities which need not be proven or litigated at trial.[27]

79.    Clean-Up Workers, working onshore or offshore, reported that they were provided minimal or no personal protective equipment on the job, including functional respirators or clothing capable of adequately protecting them. BP believed that allowing workers to wear respirators would "scare the tourists" and create a negative public image. BP therefore threatened Clean-Up Workers with termination when they tried to wear respirators or additional safety equipment on the job. Many received early termination notices after raising safety concerns on the job.

---

[27] MSA § VIII.G(3)(b) ("the following issues, elements, and proofs . . . against a [BELO Defendant] for a Later-  Manifested Physical Condition need not be proven and may not be litigated at trial . . . the alleged fault of BP for the *Deepwater Horizon* Incident; and . . . [e]xposure . . . to oil, other hydrocarbons, and other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants and/or decontaminants used in connection with the Response Activities.").

80.     Clean-up Workers, like Plaintiff, came into direct contact with oil, dispersants, and harmful chemicals.  They encountered tar mats (large pieces of petroleum product) which were of such size that it was necessary to break them into pieces to lift and remove them.  Some pieces contained a center which was gelatinous.  When this material was exposed to the air, it began volatilization and "off-gassed" into the faces or otherwise onto the workers.

81.     While performing Response Activities as a Clean-Up Worker, Plaintiff was exposed to and came into contact with oil, other hydrocarbons, chemical dispersants, and other toxic substances when his eyes, nose, mouth, and skin, and airways were exposed.

82.     As a result of this exposure, Plaintiff was diagnosed with Acquired Amegakaryocytic Thrombocytopenia on May 17, 2021, and Aplastic Anemia on June 7, 2021.  Plaintiff's exposure during the time he worked as a Clean-Up Worker for the DWH Oil Spill was a substantial contributing cause of the above listed medical conditions.

83.     As a result of Plaintiff's exposure, Plaintiff has developed a reasonable fear that in the future he may develop a severe disease, injury, or illness, including, but not limited to cancer(s) arising out of, resulting from, and/or relating to Plaintiff's Later-Manifested Physical Condition.[28]

84.     Plaintiff has suffered, and will continue to suffer, physical, mental, and emotional injuries and damages from his exposure to dangerous chemicals, including, but not limited to, physical injuries and diseases; accompanying physical, mental, and emotional pain, suffering, and anguish; the need for medical monitoring; costs and inconveniences of obtaining past and future medical treatment for exposure to chemicals; risk and fear of developing future diseases and dying from same; becoming saddled with financial burden; inconvenience; and the emotional strain of monitoring his compromised health.

---

[28] MSA § XVI A(3).

85.    As a result of Plaintiff's various diagnoses of medical conditions which were proximately caused by his exposure during the clean-up efforts, including but not limited to Acquired Amegakaryocytic Thrombocytopenia and Aplastic Anemia, Plaintiff PERCY A. BRYANT. JR., has suffered the following damages:

i.    Past and future medical expenses;
ii.    Past lost wages;
iii.    Future lost earning capacity;
iv.    Past and future intangible losses including mental anguish, anxiety, and physical pain and suffering;
v.    Scarring and disfigurement;
vi.    Other economic losses;
vii.    Loss of enjoyment of life;
viii.    Fear of future medical issues including cancer(s); and
ix.    Pre-judgment and post-judgment interest.

Moreover, Plaintiff seeks any and all damages or relief that this Honorable Court deems just and proper.

### Count II: Declaratory Judgment

86.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1-85.

87.    This Court has jurisdiction to issue a Declaratory Judgment under 28 § 2201(a) which provides "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

88.     This Court has jurisdiction to interpret and declare the rights of the parties under the MSA.[29] The MSA is to be interpreted pursuant to federal general maritime law.[30]

89.     The MSA is a contract between BP Defendants and class members, to which the Claims Administrator is an essential third party.

90.     Under the terms of the MSA, the Court "shall have ongoing and exclusive jurisdiction over the CLAIMS ADMINSITRATOR."[31]

91.     The Claims Administrator "shall faithfully implement and administer" the MSA "according to its terms and procedures" for the benefit of the class.[32]

92.     BP is responsible for paying the Claims Administrator reasonable compensation, and for covering costs and expenses related to the Claims Administrator's performance of duties described in the MSA.[33]

93.     The Garretson Resolution Group ("GRG"), now known as Epiq Class Action & Claims Solutions, Inc. ("EPIQ"), was appointed as the Claims Administrator.

94.     Before a Class Member seeking compensation from BP for a Later-Manifested Physical Condition ("LMPC") files a lawsuit, they must submit a Notice of Intent to Sue ("NOIS") to EPIQ within four (4) years after the date of diagnosis of their LMPC.[34]  Plaintiff, in good faith, properly and timely submitted an NOIS to EPIQ on or around July 5, 2024 (this was clearly submitted to EPIQ within 4 years from the date of diagnosis, or 4 years from May 17th, 2021).

---

[29] *See Mid-S. Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389 (5th Cir. 1984) ("A District Court has the power to enforce summarily a settlement agreement reached in a case pending before it.").
[30] *See id.*; *see also* MSA § XXX.P.
[31] MSA § XXI.A.1-5.
[32] MSA § II.P.
[33] MSA § XXI.A.7. The fact that BP pays EPIQ for the work they perform to administer claims has, potentially, created a "conflict" and has created "bias" in favor of BP and against the claimants.
[34] MSA § VIII.A.

95.     The purpose of the NOIS is to provide BP defendants with an option to elect to mediate the claim.[35]

96.     EPIQ must issue a Notice of Valid or Notice of Defect for a proper and timely filed NOIS. On or around July 25, 2024, Plaintiff requested that EPIQ issue such a designation to allow Plaintiff to file his claim before the expiration of the Statute of Limitations that is applicable to Mr. Bryant, May 17th, 2025 (4 years from the date of diagnosis). If a valid designation was issued by EPIQ, Mr. Bryant could reasonably rely on this designation, wait for BP to decide whether or not to mediate, and file suit within six (6) months of the issuance of Notice pursuant to the MSA.[36] If EPIQ issued a "defect", then Plaintiff could cure the defect and resubmit prior to the expiration of the Statute of Limitations. However, EPIQ's failure to act has caused Plaintiff to be unsure as to his rights which lead to the instant declaratory action.

97.     Since EPIQ failed to act by timely issuing a "valid" or "defect," it was impossible for Mr. Bryant to obtain a properly issued Election not to Mediate, and/or impossible to satisfy the condition precedent to filing a BELO claim pursuant to the MSA. Further, because EPIQ failed to provide any explanation as to why no valid and/or defect was issued, Mr. Bryant is unsure as to his rights under the MSA and, as a result, needs direction and clarification from the Court. Therefore, an actual controversy exists regarding the terms of the MSA.

98.     Plaintiff filed his first NOIS in December of 2021. Epiq sent a Notice of Valid on May 13, 2022, and BP's Election not to Mediate on September 30, 2022. Plaintiff timely filed his BELO lawsuit on January 30, 2023, within six (6) months of BP's Election not to Mediate issue date. This lawsuit (Case No. 1:23-CV-00161) was then voluntarily dismissed *without prejudice* by stipulation with BP. Voluntary dismissal of a lawsuit is expressly allowed pursuant to Federal Rule

---

[35] MSA § VIII.C.
[36] MSA § VIII.G(1)(b).

of Civil Procedure 41(a)(1). Importantly, this dismissal was stipulated by Mr. Bryant and BP, preserving Mr. Bryant's right to refile his claim within the four-year time bar set by the MSA.

99.    Plaintiff now seeks to re-litigate his BELO claim within the four-year time bar set by the MSA. Plaintiff timely submitted a new NOIS on July 5, 2024. Plaintiff's second NOIS complies with the MSA and should be processed accordingly.

100.    It is admitted that this is Mr. Bryant's second NOIS that has been filed (his original NOIS was filed in December of 2021; his second NOIS was filed on or around July 5, 2024). However, there is no language in the MSA forbidding a plaintiff from filing a second properly executed NOIS (so long as it is filed within 4 years from the date of diagnosis).

101.    By failing to perform their ministerial duties pursuant to the terms of the MSA through issuance of a VALID or DEFECT, and by failing to explain their inaction (which gave Plaintiff no way to cure the defect or address any other issue that caused EPIQ to take no action on this timely filed NOIS), EPIQ  has caused Mr. Bryant to be unsure as to his rights under the MSA and has made it impossible for Mr. Bryant to satisfy the condition precedent to file a BELO lawsuit (obtaining an Election not to Mediate). If EPIQ's failure to issue a "valid" or "defect" for the timely filed NOIS (dated July 5, 2024) was intentional, then EPIQ made a legal decision that the timely filed NOIS was somehow improper, based on EPIQ's interpretation of the contract. By making this type of quasi-judicial decision, EPIQ exceeded the bounds of its authority by attempting to define the terms of the MSA, rather than "faithfully implement and administer" them as required.

102.    Epiq has refused to process Plaintiff's second NOIS, preventing him from complying with the condition precedent defined in the MSA. Epiq has failed to provide either a Notice of Defect or a Notice of Valid and has provided no explanation as to why Plaintiff's second NOIS was not

processed pursuant to the terms of the MSA. As a result, Mr. Bryant is unsure to his rights under the MSA.

103.    Plaintiff contends that a proper and fair reading of the MSA would not restrict the constitutionally protected right of access to the courts solely because Plaintiff availed himself to the MSA pre-suit claims process on two (2) occasions.[37] EPIQ's failure to process his NOIS has prevented him from complying with the condition precedent set out in the MSA, effectively blocking his access to the Court.

104.    This conflict cannot be resolved through damages. Rather, the MSA must be interpreted, and the rights of BELO class members must be clarified.  If the class members rights are clarified in this Declaratory Action, then this clarity will benefit all class members in the future and will prevent similar conflicts in the future.

WHEREFORE, Plaintiff respectfully requests a declaratory judgment against Defendants, BP and EPIQ, clarifying the terms of the MSA in the following way:

1.  It should be found and clarified that class members are not precluded from filing more than one Notice of Intent to Sue under the terms of the MSA;

2.  If a second NOIS is filed by a class member, and the second NOIS is timely (within 4 years of the date of diagnosis) and the second NOIS is completed properly and contains all of the relevant information (i.e. diagnosing medical record and/or a physician's certification form), then EPIQ must perform their ministerial duty and issue a "valid" or a "defect." Since EPIQ failed to perform their ministerial duty by issuing a "valid" or "defect," as required by the MSA, the instant action should be stayed and the Court

---

[37] *See Borough of Duryea v. Guarnieri*, 564 U.S. 883, (2011) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.") (collecting cases) (alterations in original).

should order EPIQ to properly perform their ministerial duties so that Mr. Bryant can obtain an Election not to Mediate, so the condition precedent required by the MSA can be satisfied and the instant action can continue.

### Count III: Specific Performance

105.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1-104.

106.    As explained above, the MSA requires the third-party Claims Administrator, EPIQ, to review and process each completed NOIS.[38]

107.    EPIQ has refused and continues to refuse to process Plaintiff's NOIS despite reminders of their duty to process from Plaintiff's Counsel.

108.    EPIQ's refusal to process the Notice of Intent to Sue is effectively blocking Plaintiff's Constitutional right to access to the court to seek redress of injuries. Therefore, remedies at law are inadequate.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows: i) Specific performance requiring the Claims Administrator to process Plaintiff's Notice of Intent to Sue and ii) a tolling of Plaintiff's Statute of Limitations for bringing this BELO lawsuit while the Claims Administrator processes such. Alternatively, Plaintiff requests the Court allow Plaintiff's BELO lawsuit to proceed under a waiver of the condition precedent due to the Claims Administrator's failure to process the Notice of Intent to Sue.

109.    Plaintiff requests a trial by jury.

WHEREFORE, Plaintiff prays that the BP Defendants be duly cited to appear and answer this Complaint and that this Honorable Court grant Plaintiff relief to which he is entitled to under

---

[38] MSA § XXI.I.

the law and against both the BP Defendants and EPIQ, including court costs and compensatory damages.

Respectfully Submitted,

**THE DOWNS LAW GROUP, P.A**.
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Telephone (305) 444-8226
Facsimile: (305) 444-6773

*/s/ C. David Durkee*
**C. DAVID DURKEE, ESQ.**
FL BAR NO: 998435
Email: ddurkee@downslawgroup.com

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument was filed with the Clerk of Court by using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system. Dated this 30th day of August 2024.

*/s/ C. David Durkee*
**C. David Durkee, Esq.**